Case 4:19-mj-00040-RSB   Document 3-1   Filed 10/04/19   Page 1 of 20   Pageid#: 7

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

10/04/2019

JULIA C. DUDLEY, CLERK
BY: A. Seagle
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER URL:<br><br>https://www.facebook.com/bendi.davis<br><br>THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 4:19mj40<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Derrick Lancaster, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user URL http://www.facebook.com/bendi.davis that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user URL, including the content of the subscriber's or customer's account.

1

2. Since October 2017, I have been a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), within the Washington Field Division, Roanoke, Virginia Field Office. I am a 10-year veteran, with the City of Danville, Virginia Police Department, and, since November 2016, have been assigned to the special investigations division. I have received training in areas of narcotics investigations including search and seizure laws and statutes pertaining to enforcement of the Controlled Substances Act. Since becoming a sworn law enforcement officer in 2009, I have either conducted or assisted other law enforcement officers in conducting numerous narcotics investigations that have resulted in the arrest and conviction of numerous individuals. In addition, I have been qualified, as a subject matter expert in narcotics distributing, within the Circuit Courts of the City of Danville, Virginia.

3. I am knowledgeable about state and federal drug laws, and have participated in numerous narcotic distributing investigations. I have also conducted and participated in the debriefing of many drug traffickers, through which I have learned valuable information regarding the techniques used by drug traffickers to distribute drugs in domestic markets. Additionally, I have testified in grand jury proceedings related to the investigation of individuals involved in drug trafficking. As a result of my on the job experience, I am familiar with the way in which drug traffickers illegally traffic, transport, and distribute narcotics.

4. Based on my training and experience investigating narcotics and the distribution of narcotics, I know that it is common for individuals engaged in this activity to use social media platforms (i.e. Facebook), to further their criminal activities. I am aware that Facebook is a social media platform that allows communication, between multiple parties, utilizing the "messenger" application. I am aware that this type of communication plays an integral role in the daily lives of individuals engaging in narcotics trafficking and that these

individuals use this type service to exchange information with customers and/or source(s) of supply through messaging, instant messaging, and voice conversations.

5. As an ATF Task Force Officer, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of, and to make arrests for, offenses in violation of Titles 18 and 21 of the United States Code.

6. The facts in this affidavit come from my own investigation, observations, training and experience, and information obtained from other law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that Bendi Williamson DAVIS (hereinafter "DAVIS"), and others known and unknown, are engaged in a conspiracy to violate federal drug laws—to wit: conspiracy to distribute methamphetamine, cocaine and heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**TECHNICAL BACKGROUND ON FACEBOOK**

8. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users and sometimes with the general public.

9. Facebook asks users to provide basic contact and personal identifying information to Facebook during the registration process or later. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

10. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

11. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A

Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

12.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

13.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

14.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.

Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

15. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

16. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

17. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

18. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

19. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

20. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

21. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

22. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

23. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

24. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile,

that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

25. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

26. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of an offense or, alternatively, to exclude the innocent from further suspicion. The "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "Friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

27. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## PROBABLE CAUSE

28. The United States, including the Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and the City of Danville, Virginia Police Department (DPD) are conducting a criminal investigation of Bendi Williamson DAVIS (hereinafter "DAVIS") and other subjects known and unknown regarding possible violations of conspiracy to distribute methamphetamine, cocaine, and heroin, in violation of 21 U.S.C. §§ 841(a)(1) and §846.

29. Between September 4, 2018 and September 6, 2018, DAVIS, on three separate occasions, distributed controlled illegal narcotics, to a Confidential Source (CS), within the Western District of Virginia as detailed below.

30. Through investigation I know that DAVIS has a Facebook account with a user URL of http://www.facebook.com/bendi.davis.

31. On or about September 4, 2018, DAVIS communicated with the CS, utilizing Facebook Messenger (URL: http://www.facebook.com/bendi.davis) about setting up a sale of cocaine. DAVIS refers to the cocaine as "girl" (which your affiant is aware, based off training and experiences, is slang for powder cocaine). In addition, via Facebook Messenger conversation with the CS, DAVIS spoke about "Ice" (which your affiant is aware, based off training and experiences, is slang for crystal methamphetamine) and provided the CS with the prices, per weight, for the methamphetamine. On this date, following the Facebook Messenger conversation, the CS provided $50.00 in documented United States Currency to DAVIS, and, in return, the CS received 0.33 grams of suspected cocaine from DAVIS. A subsequent lab analysis showed the substance obtained from DAVIS to contain cocaine. Below are screenshots of the Facebook Messenger conversation between DAVIS and the CS:







13









17

32. In addition, on or about September 5, 2018, DAVIS, utilizing **Facebook URL http://www.facebook.com/bendi.davis**, exchanged Facebook Messenger communications with the CS, setting up the sale of cocaine by Davis to the CS. On this date, following the Facebook Messenger conversation, the CS in fact provided $110.00 in documented United States Currency to DAVIS, and, in return, the CS received 0.98 grams of suspected cocaine from DAVIS. A subsequent lab analysis showed the substance obtained from DAVIS to contain cocaine.

33. Also on or about September 6, 2018, the CS purchased a quantity of heroin, along with a quantity of suspected methamphetamine, from DAVIS. On this date, the CS provided $130.00 in documented United States Currency to DAVIS, and, in return, the CS received 0.13 grams of suspected heroin, along with 0.6 grams of suspected methamphetamine, from DAVIS. Subsequent lab analysis showed the substances obtained from DAVIS to contain heroin and methamphetamine.

34. Based upon the information outlined above, there is probable cause that DAVIS utilized Facebook URL http://www.facebook.com/bendi.davis to set up and in furtherance of narcotic distribution. DAVIS has utilized the Facebook URL http://www.facebook.com/bendi.davis in connection with illegal drug distribution since at least the month of September 2018. In addition, DAVIS' Facebook account is still being utilized, evidenced by continuous and current public postings.

35. Therefore, it is respectfully submitted that probable cause exists that the data maintained and stored at the premises of Facebook associated with the Facebook user URL http://www.facebook.com/bendi.davis will lead to evidence, fruits, or instrumentalities of the

crime described above and could assist in identifying additional witnesses and suspects that are involved in the narcotics distribution conspiracy.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

36. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the <u>records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.</u>

### CONCLUSION

37. Based on the foregoing, I request that the Court issue the proposed search warrant.

38. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, this Court is a "district court of the United States . . . that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

39. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

<table>
<tr><td>

**Received in Chambers**
By Reliable Electronic Means

October 4, 2019

**Hon. Robert S. Ballou
United States Magistrate**

</td><td>

Respectfully submitted,

s/Derrick Lancaster

_____
Derrick Lancaster, Task Force Officer
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

</td></tr>
</table>

Subscribed and sworn to before me on October 4, 2019.
Attested to telephonically.

*Robert S. Ballou*
_____
The Honorable Robert S. Ballou
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF VIRGINIA

20